1 | ALAN KELLY (AZ State Bar No. 026996)
SCOTTSDALE LINCOLN HEALTH NETWORK
2 | Office of General Counsel
8125 N. Hayden Rd,
3 | Scottsdale, AZ 85258
Telephone:  (480) 882-4007
4 | Facsimile:  (480) 882-5855
Email:  akelly@sch.org
5 |
GLENN E. SOLOMON (CA State Bar No. 155674) (Pending Pro Hac Vice Admission)
6 | AMANDA L. HAYES-KIBREAB (CA State Bar No. 224403) (Pending Pro Hac Vice
Admission)
7 | **HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East, Suite 1600
8 | Los Angeles, California 90067-2517
Telephone: (310) 551-8111
9 | Facsimile: (310) 551-8181
E-Mail:  ahayes-kibreab@health-law.com
10 |
Attorneys for Plaintiffs
11 |
12 | **UNITED STATES DISTRICT COURT**
13 | **DISTRICT OF ARIZONA**
14 |

| | |
|---|---|
| 15  Scottsdale Healthcare Hospitals, | CASE NO. |
| 16      Plaintiffs, | **COMPLAINT FOR:** |
| 17  v. | **1.  VIOLATIONS OF ERISA** |
| 18  Aetna U.S. Healthcare, Inc., an Arizona | **(29 U.S.C. § 1132(a)(1)(B))** |
| Corporation; Aetna Health Inc., a Colorado | **2.  BREACH OF CONTRACT – PROVIDER AGREEMENT** |
| 19  Corporation; Aetna Life Insurance | **3.  BREACH OF IMPLIED-IN-LAW CONTRACT** |
| Company, a Colorado Corporation; and | **4.  BREACH OF IMPLIED-IN-FACT CONTRACT** |
| 20  Does 1 through 100, | **5.  INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** |
| 21      Defendants. | **6.  INTENTIONAL INTERFERENCE WITH CONTRACT** |
| 22 | **7.  DECLARATORY RELIEF** |
| 23 | |
| 24 | **JURY TRIAL DEMANDED** |
| 25 | |
| 26 | |

27 |
28 |

1.     Plaintiff Scottsdale Healthcare Hospitals, formerly known as John C. Lincoln
Health Network dba John C. Lincoln Hospital – North Mountain and John C. Lincoln –
Deer Valley (together "JCL") complains and alleges as follows:

2.      This complaint arises out of underpayment for health care services rendered
by JCL from March 1, 2014 through December 21, 2014 (the "Out-of-Network Period").
JCL provided medically necessary emergency services and authorized services during that
time to certain patients (the "Patients") that one or more of the defendants was legally
obligated to pay.

3.     The key defendant in this lawsuit is Aetna U.S. Healthcare, Inc., an Arizona
corporation that operates under the national Aetna umbrella, and affiliates Aetna Health,
Inc. and Aetna Life Insurance Company (together "Aetna").  Aetna is connected to each of
the underpaid claims in one of two ways: (1) as the health insurer that incorrectly priced
and subsequently underpaid the claims, or (2) as the third party administrator that
processed and incorrectly priced claims on behalf of self-insured payors ("Other Payors").
Aetna's model is set up such that the distinction between whether Aetna insures the patient
versus just administers insurance for another one of the defendants is not always
transparent to JCL and/or the Patients.  JCL is informed and believes that Aetna prefers
this lack of transparency for marketing purposes because it means that providers and
members will look solely to Aetna, not to the Other Payors, as the point of contact for all
claims handling purposes, leaving the Other Payors in the background, with Aetna as the
front, or face, to the outside world.

4.     By this lawsuit, JCL seeks to enforce its rights pursuant to the written
Managed Care Agreement between the parties.  JCL's patients, Aetna's members, also
have rights to proper reimbursement under the terms of their member benefit plans, which
they have assigned to JCL.  Thus, separate and apart from JCL's direct rights pursuant to
the parties' agreement, JCL as derivative rights under the terms of the patient's health
benefit plans.  On information and belief, under those plan documents the patients whose
claims are at issue here are entitled to reimbursement pursuant to the terms of any existing

1   agreement between the parties.  Even if JCL did not have derivative rights pursuant to the
2   patients' benefit plans, JCL would still be entitled to pursue its direct contract rights.

3       5.      In order to preserve the privacy interests of the patients whose claims are at
4   issue in this case in their protected health information, JCL has filed a redacted list of
5   underpaid claims with this public complaint.  JCL has already provided an unredacted list
6   of underpaid claims to Aetna and will provide an updated that list to all Defendants and the
7   Court in a confidential manner subject to protective order, as appropriate, up to and
8   including the date of trial.

9       6.      Aetna naturally is connected to all of these claims because JCL is informed
10  and believes that Aetna performed the processing and pricing functions for all of them,
11  whether or not Aetna was the insurer versus the administrator.  JCL is informed and
12  believes that the Other Payors used Aetna to process and price these claims.

13  **I.**

14  **JURISDICTION AND VENUE**

15      7.      This Court has subject matter jurisdiction over this action pursuant to 28
16  U.S.C. § 1331, because the action arises under the laws of the United States; pursuant to 29
17  U.S.C. § 1332, because the action seeks to enforce rights under the Employee Retirement
18  Income Security Act ("ERISA"), and because the State law claims are so related to the
19  federal claims that they form part of the same case or controversy for purposes of
20  supplemental jurisdiction.

21      8.      This Court is the proper venue for this action pursuant to 28 U.S.C. §
22  1391(b) because a substantial part of the events or omissions giving rise to the claims
23  alleged herein occurred in this Judicial District, and because one or more of the Defendants
24  conducts a substantial amount of business in this Judicial District.

25  **II.**

26  **THE PARTIES**

27      9.      Plaintiff Scottsdale Healthcare Hospitals, formerly John C. Lincoln Health
28  Network dba John C. Lincoln Hospital – North Mountain and John C. Lincoln – Deer

1  Valley, referred to herein as JCL is, and at all relevant times was, an Arizona corporation

2  organized and existing under the laws of Arizona, with its principal place of business in

3  Phoenix, Arizona.  JCL is, and at all relevant times was, a hospital and health care provider

4  licensed and in good standing under the laws of Arizona.

5      10.    JCL is informed and believes that defendant Aetna U.S. Healthcare Inc.

6  ("Aetna Arizona") is a corporation duly organized and existing under the laws of the State

7  of Arizona and is authorized to transact, and is in fact transacting, the business of

8  insurance in Arizona.  JCL is informed and believes that Aetna's principal place of

9  business is in Phoenix, Arizona.

10     11.    JCL is informed and believes that Defendant Aetna Health Inc., ("Aetna

11  Health") is a corporation duly organized and existing under the laws of the State of

12  Colorado and is authorized to transact, and is in fact transacting, the business of insurance

13  in Arizona.  JCL is informed and believes that principal place of business is in Hartford,

14  Connecticut.

15     12.    JCL is informed and believes that Defendant Aetna Life Insurance Company,

16  ("Aetna Life") is a corporation duly organized and existing under the laws of the State of

17  Connecticut and is authorized to transact, and is in fact transacting, the business of

18  insurance in Arizona.  JCL is informed and believes that principal place of business is in

19  Hartford, Connecticut.

20     13.    Aetna Arizona, Aetna Health and Aetna Life are collectively referred to

21  herein as "Aetna" or "Defendants."  JCL refers to the Aetna Defendants collectively

22  because they have made it unclear through their actions which of them is actually in

23  control of decision among them as to the wrongdoing set forth below.

### III.

### AGENCY

26     14.    Aetna is either an independent contractor of or the agent for the Other

27  Payors.  If Aetna is the agent of the Other Payors it has actual or ostensible authority to act

28  on the Other Payors behalf for:  (a) certifying or authorizing JCL's provision of services to

1  all Defendants' members; (b) receiving JCL's claims; (c) pricing the claims; (d) processing

2  and administering the claims and appeals; (e) approving or denying the claims; (f) deciding

3  not to transfer the members to in-network hospitals for post-stabilization services;

4  (g) directing whether and how to pay the claims; (h) issuing remittance advices and

5  explanations of benefits; (i) communicating with JCL regarding the claims and services;

6  (j) communicating with members regarding the claims and services; (k) providing

7  utilization management services; and (m) in many instances issuing payment.

8       15.    JCL is informed and believes that, as the appointed agents of the Other

9  Payors, Aetna is in possession of all facts, information and data concerning and related to

10  the authorization, processing, pricing and payment of all claims submitted by JCL to the

11  aforementioned Defendants.

12  **IV.**

13  **<u>ASSIGNMENT AND STANDING</u>**

14       16.    As a condition of admission, each patient at JCL signs a Conditions of

15  Admission form agreeing to, *inter alia*, assign his or her health insurance benefits to JCL.

16  Each assignment of benefits provides for JCL to be paid directly for the services provided

17  to the patient.  JCL's Assignment of Insurance Benefits reads as follows:  "I assign to

18  JCLHN . . .  any insurance benefits payable on my behalf for services received from

19  JCLHN . . . , including those from health insurance . . . or third parties."

20       17.    JCL has standing to pursue the claims at issue in this Complaint as an

21  assignee of its patients' benefits under health benefit plans governed by ERISA.

22       18.    Shortly after the discharge of each patient, JCL's computerized billing

23  system generates an itemized list of services and products used to deliver care to the

24  patient.  From this list, JCL generates a standardized bill on the national industry standard

25  UB-04 form used to bill insurance payors.  Aetna was notified of the patients' assignments

26  of benefits directly on each UB-04 bill they received from JCL in connection with each

27  claim at issue in this case.  Specifically, JCL unequivocally indicated in field 53 of each

28  UB-04 bill that it was seeking payment based upon an assignment of benefits.

1180726.3

19.     After these UB-04 bills were submitted, JCL then engaged in an extensive administrative process to attempt to get Aetna and the other Payors to pay according to the agreed contract rates.

20.     Moreover, the ERISA statute and regulations require Defendants to provide relevant plan documents. 29 U.S.C. § 1104, 1024 and 1132; 29 C.F.R. § 2560.503-1. At no time during the administrative process did any of the Defendants ever send any plan documents containing any anti-assignment provision to JCL.

21.     To the extent that any plan documents have any anti-assignment provisions, Defendants have waived their right to assert such anti-assignment provisions as a defense to paying JCL's claims.

22.     The ERISA regulations required Defendants, *inter alia*, to state (i) the specific reason or reasons for the adverse determination, and (ii) reference to the specific plan provisions on which the determination is based. 29 C.F.R. § 2560.503-1(g)(1). At no time during the administrative process did Defendants ever state that the specific reason for the adverse benefit determination was due to an anti-assignment provision, nor did they reference a specific anti-assignment provision in any plan document.

23.     Throughout the entire administrative process for thousands of claims, Aetna never referenced any anti-assignment provisions of any plan, never refused to communicate with JCL based on any such anti-assignment provisions, never refused to process any of JCL's claims based on any such anti-assignment provisions, never refused to entertain an appeal filed by JCL, or never refused to pay any of JCL's claims based on any such anti-assignment provisions. In short, at no time during the extensive course of dealing between the parties did Aetna ever actually invoke any purported anti-assignment clauses.

## V.

## <u>ALLEGATIONS COMMON TO ALL CLAIMS</u>

24.     It is standard in the health care industry that when a hospital, such as JCL, enters into a comprehensive, written contract with a health plan, such as Aetna and its

1180726.3

affiliates, it agrees to accept reimbursement that is discounted from the hospital's total billed charges in exchange for the benefits of being a "network provider" (i.e., a provider with a written contract with the plan to be in-network).  These benefits typically include an increased volume of business because the health plan identifies to its members that the contracted provider is "in-network," which means that the member is able to obtain services from the in-network provider upon the member's payment of a reduced amount of, or no, co-insurance.  The "in-network" designation results in steerage of members and increased business to in-network providers.

25.    Conversely, when a hospital, such as JCL, does not have a comprehensive, written contract with a health plan to be in-network, it is standard in the industry that the hospital receives less business from the plan, as the health plan discourages its members from receiving their non-emergency care at the out-of-network provider.  Because, in such circumstances, the health plan is discouraging its members from receiving their care at the out-of-network hospital, it is also standard in the industry that the out-of-network hospital has no obligation to reduce its charges, and is entitled to receive payment based on its charges for the services rendered, so long as those charges are reasonable and customary.  Indeed, the terms "billed charges" and "reasonable and customary" typically have been used interchangeably for years, if not decades, to be one and the same thing so long as the provider's charges remain in line with the amount charged by other similarly situated providers for similarly situated services in an out-of-network setting.

26.    From May 1, 1998 to March 1, 2014, JCL had a Managed Care Agreement to be in-network with Aetna pursuant to which JCL provided inpatient and outpatient medical services to members of Aetna and its affiliates, including the Other Payors (the "MCA").  JCL provided such services to Aetna and the other Payors at the negotiated rates set forth in MCA in exchange for the increased volume of patients JCL received as an Aetna "in-network" provider.

27.    The discounted rates included per diem rates, case rates and percentage of charges rates for various types of services provided by JCL.  The initial term of the MCA

1   was for two years.  Anticipating that the parties may not be able to negotiate new

2   discounted per diem and case rates, effective February 15, 2002, JCL and Aetna agreed to

3   discounted rates based upon the terminated contract rates and a percentage of charges

4   following termination of the rest of the MCA:

> Upon termination of this Agreement for any reason, other than termination by Company in accordance with section 7.4 above, Hospital shall remain obligated <u>at Company's sole discretion to provide Hospital Services</u> to:  (a) any Member who is an inpatient at Hospital as of the effective date of termination until such Member's discharge or Company's orderly transition of such Member's care to another provider, the terms of this Agreement shall apply to such services; and (b) any Member, who has received prior authorization or has been scheduled for services or is in their second or third trimester of pregnancy, for up to one (1) year.  The terms of this Agreement shall apply to such services.  ***<u>All other services shall be reimbursed at ninety percent (90%) of billed charges</u> for up to one (1) calendar year.***  (Emphasis added)

12       28.     Section 7.5 of the MCA provides that all of Section 7.5, including Section

13   7.51 "shall <u>survive</u> termination of this Agreement, regardless of the cause of termination."

14   Emphasis added.

15       29.     JCL agreed to this provision so that Aetna and the Other Payors who

16   accessed the contract would not have to pay JCL's claims at its full-billed charges (for the

17   one year this provision was in effect), and in exchange for agreeing to accept the

18   terminated discounted contract rates for those services that Aetna elected to have JCL

19   provide.  The first two sentences provide for payment at the terminated contract rates for

20   patients who were either in the hospital at the time of termination, had already been

21   authorized for services at the time of termination, or were obstetrics patients at the time of

22   termination.  The last sentence provides that for all other patients the hospital would be

23   reimbursed at 90% of billed charges.

24       30.     Aetna cannot argue that it is somehow surprised by JCL's charges because

25   (1) Aetna had years of experience receiving claims with those charges; and (2) Arizona

26   law has well-established comprehensive guidelines and procedures for setting, filing,

27   review and disclosure of hospitals rates and charges.  Arizona Revised Statutes ("A.R.S.")

28   §§ 36-436 to 436.03.  Hospitals cannot "increase any rate or charge until the proposed

8

1   increase has been filed with the director of the Director of the Arizona Department of

2   Health Services and reviewed." *Id.*; Ariz. Admin. Code R 9-11-303(B). JCL complied

3   with all Arizona laws concerning the setting, filing, review and disclosure of hospitals

4   rates and charges, and as such continuously makes such rates publicly available to

5   everyone, including Aetna.

6       31.   Under Arizona law, "There is nothing illegal or unauthorized, however,

7   about hospitals contracting with insurers and government entities to accept reduced

8   payments in satisfaction of their published rates, in return for an anticipated volume of

9   business and prompt payments. Nor does the fact that hospitals routinely accept reduced

10  payments on behalf of many patients mean that the published and billed rates are

11  unreasonable." *Banner Health v. Medical Sav. Ins. Co.*, 216 Ariz. 146, 151-52 (2007).

12      32.   Aetna entered into the MCA on behalf of, and for the benefit for, its

13  affiliates, including the Other Payors. Indeed, under the terms of the MCA, Aetna could –

14  and, on information and belief, did contract with Payors wishing to utilize the services of

15  Aetna's the Managed Care Network, and incorporating the terms and conditions of this

16  Agreement." The MCA defines Payors to include "an employer, insurer, health

17  maintenance organization, labor union, organization or other person or entity which has

18  agreed to be responsible for funding benefit payments for Covered Services provided to

19  Members under the terms of a Plan." The MCA defines Plan as "any health benefit

20  product, plan or program issued, administered, or serviced by Company or one of its

21  Affiliates, including but not limited to HMO, preferred provider organization, indemnity,

22  Medicaid, Medicare and Workers Compensation." Each of the Payors sought and accepted

23  the benefits of the MCA by accessing JCL as an in-network provider and paying

24  discounted in-network rates, as a Payor under the terminated agreement.

25      33.   By accepting the benefits of the MCA, all Defendants – including the Other

26  Payors, became bound by its terms. *See Duncan v. Nowell*, 27 Ariz. 451, 456 (1925) ("The

27  rule of law is that one who seeks to take advantage of a contract made for his benefit by

28  another must take it subject to all legal defenses and inherent equities arising out of the

1    contract as between the parties thereto, and must bear the burdens thereof.").

2                    **Aetna's Failure To Offer JCL Fair And Reasonable Rates**

3            34.    Near the end of the term of the MCA, JCL attempted to negotiate new rates

4    with Aetna.  However, Aetna would not offer JCL fair or reasonable rates or terms for a

5    new contract.

6            35.    As a result, the MCA terminated effective March 1, 2014, at which time the

7    surviving Discounted Post-Termination Rate provision became effective.

8            36.    Following the termination of the MCA, the Defendants paid some, but not

9    all, claims at the Discounted Post-Termination Rates set forth in Section 7.5.1 of the MCA.

10           37.    The Discounted Post-Termination Rate Provision gave Defendants a

11   discount off JCL's full-billed charges and certainty to the parties.  Without the benefit of

12   in-network rates or the Discounted Post-Termination Rates provided in the MCA, Aetna

13   would be required to pay JCL's claims based on its full-billed charges for medical services

14   provided to its members.

15           38.    Rather than paying JCL's claims based on the Discounted Post-Termination

16   Rates from March 1, 2014 through December 31, 2014, Aetna instead underpaid JCL's

17   claims by erroneously applying a flawed, secret and legally inappropriate reasonable and

18   customary analysis to many of the claims.

19           39.    Aetna's systems for paying out-of-network claims are flawed.  Aetna

20   improperly manipulates the data in its systems to calculate incorrect and inappropriately

21   low reimbursement amounts for out-of-network hospital claims, and Aetna's systems and

22   methods for calculating the rates for out-of-network providers violates the provisions of

23   the members' insurance policies, ERISA and other states' and Arizona law.

24           40.    During the Out-of-Network Period, the volume of business that JCL received

25   from Defendants' members and insureds substantially declined because Aetna no longer

26   identified JCL as "in-network," and discouraged their members from coming to JCL for

27   scheduled health services by Defendants.

28           41.    JCL, however, continued to provide medically necessary services to patients

1   who come through the emergency room with insurance policies with one or more of the

2   Defendants or were authorized by Aetna to receive care.  In the case of emergency medical

3   services, JCL was legally obligated to provide such services in accordance with state and

4   federal law.

5   **Aetna's Central Role In Underpaying JCL's Claims**

6       42.    Aetna is one of the largest private health insurers in Arizona and is one of the

7   largest health insurers in the country.  As such, each year Aetna issues thousands of health

8   insurance policies and processes millions of claims submitted by out-of-network providers

9   for services provided to their members.  To facilitate access to care in Arizona, Aetna

10  contracts with the Other Payors to provide claim pricing and other administrative services

11  for those entities' health plans.  On information and belief, these contracts are structured

12  such that Aetna is incentivized to keep benefit costs to the funding entity low.

13      43.    People who receive their health insurance through a private employment

14  based benefit plan are typically participants or beneficiaries of plans governed by the

15  federal Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001

16  *et seq*.  Sometimes the ERISA plans are fully insured by health insurers such as Aetna.

17  Sometimes the plan is self-funded, in which case the plan is financially responsible for the

18  claims arising from that plan.

19      44.    When an ERISA plan is fully insured by Aetna, the insurer (Aetna) is not

20  only responsible for administering claims brought under the plan, but is also financially

21  responsible to pay claims associated with the plan.

22  **Aetna Controls the Decision Whether A Payor Will Honor or Deny Claims**

23      45.    JCL is informed and believes that Aetna is the ERISA plan administrator and

24  ERISA fiduciary for the ERISA claims at issue in this Complaint, or is otherwise a proper

25  ERISA defendant because it "effectively controlled the decision whether to honor or to

26  deny a claim . . . ."  *Cyr v. Reliance Life Ins. Co.*, 642 F.3d 1202, 1204 (9th Cir. 2011).

27      46.    With respect to the self-insured ERISA plans at issue herein, the self-insured

28  plan enters into an "administrative service agreement" ("ASA") with Aetna, to perform

1  administrative and other key responsibilities, such as (a) certifying or authorizing JCL's

2  provision of services to members; (b) receiving JCL's claims; (c) pricing the claims;

3  (d) processing and administering the claims and appeals; (e) approving or denying the

4  claims; (f) deciding not to transfer the members to in-network hospitals; (g) directing

5  whether and how to pay the claims; (h) issuing remittance advices and explanations of

6  benefits; (i) communicating with JCL regarding the claims and services;

7  (k) communicating with members regarding the claims and services; and (m) in many

8  instances issuing payment.  On information and belief, these ASAs are structured such that

9  Aetna has a financial incentive to keep benefit costs to the funding entity low.

10      47.     On information and belief, Aetna functions as an ERISA plan administrator

11  with respect to those claims upon which they have exercised delegated authority to provide

12  plan documents to participants and beneficiaries, receive benefit claims, evaluate and

13  process those claims, review the terms of the plan, make initial benefit determinations,

14  make and administer benefit payments, handle appeals of benefit determinations, and serve

15  as the primary point of contact for members and providers to communicate regarding

16  benefits and benefit determinations.  In carrying out these ERISA plan administrator

17  functions, Aetna possesses authority and fiduciary discretion to manage and administer the

18  Other Payors' ERISA plans.

19      48.     Moreover, to the extent any of the ASAs provide that Aetna is not an ERISA

20  fiduciary, or have no authority or fiduciary discretion to manage and administer the Other

21  Payors' ERISA plans, then any decisions made by Aetna with respect to pricing or

22  interpretation of benefits under the applicable plan is entitled to no deference whatsoever.

23  Indeed, JCL is informed and believes that certain ASAs specifically state that Aetna has no

24  obligation or responsibility for the plan's compliance with ERISA.  To the extent Aetna is

25  not a plan fiduciary – and lacks discretionary authority – then the applicable Other Payors

26  have wholly abdicated their responsibility to exercise discretion under the plan and to

27  ensure that Aetna's payment methodology complies with controlling plan language.

28      49.     However, regardless of whether the Other Payors intended for Aetna to act

as plan administrators or to assume fiduciary functions – and regardless of the terms of any ASA – Aetna effectively controls the decision whether to honor or deny claims under the ERISA plans and are therefore proper ERISA defendants.  Indeed, on information and belief, in most instances the Other Payors have little or no involvement in claims administration or pricing, and defer entirely to Aetna.

50.     For instance, on information and belief, as set forth in detail below, Aetna:

a.      drafts and provides plan members with plan documents;

b.      operates a centralized verification and authorization telephone number which handles calls for members of the other Payors, including the Other Payors;

c.      receives and processes electronic bills from JCL for claims for members of the Other Payors;

d.      issues remittance advices and EOBs;

e.      prices claims for the Other Payors, including making the decision not to pay the proper 90% of billed charge post-termination rate;

f.      communicates with JCL with respect to pricing of claims for Aetna and the Other Payors;

g.      processes appeals, and sends appeal response letters; and

h.      in many instances, issues payment.

**Reasonable Payment If Contract Held To Not Apply**

51.     To the extent that the post-termination provisions set forth in Section 7.5.1 of the MCA are held not to apply, the claims submitted by JCL to Aetna for pricing and payment must be paid according to a payment rate that is referred to interchangeably in the industry and in the Defendants' own ERISA plan documents as the "Usual, Customary and Reasonable" rate, the "Reasonable and Customary" amount, the "Usual and Customary" amount, the "Reasonable Charge," the "Prevailing Rate," the "Usual Fee," the "Competitive Fee," or some other similar phase that, in the context of the health industry, mean the same thing.

1180726.3

52.     As explained in detail below, JCL is informed and believes that Aetna's methodology and systems for determining reasonable and customary and paying out-of-network hospital claims are flawed, that Aetna improperly manipulates the data in its systems to calculate incorrect and inappropriately low amounts in paying hospital claims, and that Aetna's systems and methods for calculating the reasonable and customary rates for out-of-network providers violates the members' policies, ERISA, and other states' and Arizona law.

53.     JCL is informed and believes that the relevant ERISA plans, SPDs or EOCs contain standards and definitions for how reasonable and customary amounts are to be calculated.  All of these standards or definitions require out-of-network hospital claims to be either paid in accordance with applicable agreements covering out-of-network care, or based upon a comparison of the amount the hospital charges for its services compared to the amount that other hospitals in the same geographic region charge for the same services.

54.     JCL is informed and believes that the SPDs or EOCs at issue, have similar definitions and standards for calculating reasonable and customary payments.  JCL will seek all of the EOCs and SPDs in discovery.  As an assignee of the patients whose claims are at issue here, JCL is also entitled to request such plan documents pursuant to 29 U.S.C. § 1024(b).

55.     Federal courts have recognized that "[s]uch a standard is common among medical benefits plans governed by ERISA," *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 411 (6th Cir. 1998), and that under that standard, rates must be determined "from a survey of average treatment charges in a given geographic region." *Geddes v. United Staffing Alliance Emp. Med. Plan*, 469 F.3d 919, 929-30 (10th Cir. 2006).

56.     The amount of payment is properly determined based on a review of the prevailing or competitive charges for similar healthcare services by similar types of providers within the same geographic area at the time.  However, Aetna, on behalf of themselves and the Other Payors, have systematically failed to properly price the claims according to reasonable and customary, and have systematically concealed this failure,

1 through misrepresentations and concealments about their pricing and payment methods.

2     57.    JCL is informed and believes that Aetna prices claims for medically

3 necessary services that JCL provides to patients who are members of Aetna, the Other

4 Payors, including health plans that are funded by the members' employer, and health plans

5 that are fully insured by Aetna. Many of these health plans are governed by ERISA.

6 These ERISA plans have fiduciary duties as the designated plan administrators to ensure

7 that out-of-network claims are properly priced and paid under the terms of the plans and

8 according to reasonable and customary. However, the ERISA plans have participated with

9 Aetna in the systematic underpricing of claims.

10     58.    JCL is informed and believes that, at all relevant times, Aetna improperly

11 processed and priced the claims at issue, using improper reimbursement methodologies to

12 systematically underpay claims submitted by JCL instead of paying the appropriate rate.

13 JCL is also informed and believes that the Other Payors exercised no discretion in

14 reviewing or approving the payments made by Aetna on their behalf.

15 **Emergency and Elective Services Provided**

16     59.    Under the federal Emergency Medical Treatment and Active Labor Act

17 ("EMTALA"), Social Security Act § 1867(a), and A.R.S. § 20-2803, individuals who

18 believe that they are suffering a medical emergency have the right to seek treatment at the

19 nearest emergency room, and hospitals which have emergency rooms, including JCL, have

20 a statutory duty to provide emergency services and care to all individuals regardless of the

21 patients' ability to pay or their possession or type of insurance benefits.

22     60.    Therefore, by law, when a member of any Defendant presents themselves to

23 JCL's emergency room, JCL is legally obligated treat that person without regard to the

24 person's ability to pay and without first obtaining insurance verification or authorization to

25 provide the treatment. JCL cannot refuse to provide emergency treatment to one of

26 Defendants' members simply because JCL is out-of-network with Aetna and the patient

27 does not have the personal resources to pay for such emergency care.

28     61.    JCL is informed and believes that the health care benefit plans, SPDs, EOCs

1    or policies of Payors require each of the Defendants to pay an agreed upon rate, or absent

2    that, billed charges or a reasonable and customary rate for emergency medical care.  For

3    example, on information and belief, a typical policy reads "**If Aetna has an agreement**

4    **with a provider (directly, or indirectly through a third party) which sets the rate that**

5    **Aetna will pay for a service or supply, then the recognized charge is the rate**

6    **established in such agreement**."

7         62.    JCL performed duties that are the responsibility of Defendants by providing

8    medical care to their respective members that was immediately necessary to prevent

9    serious bodily harm to or suffering by these members.  JCL provided these immediately

10   necessary medical services with the intent to charge its customary rates for its services.

11        63.    JCL's billed charges are reasonable and customary.  JCL's charges are

12   comparable to other hospitals in its geographic area and other hospitals that provide the

13   same quality of services.  Compared to other similar quality hospitals in the area, and

14   compared to other hospitals that have comparable reputations and offer comparable high

15   quality services, JCL's charges are reasonable and customary for out-of-network services.

16        64.    Members of Defendants sought emergency treatment at JCL for various

17   serious and emergent injuries, or other various serious and emergent health conditions.

18        65.    With respect to every claim at issue in this litigation, after providing the

19   medically necessary service, JCL timely submitted the appropriate claim forms for

20   payment to Aetna, as instructed by the patient's health insurance card.  The claim forms

21   include information such as the type of procedure, the coding for the procedure, the fact

22   that JCL received an assignment of health care benefits from the member, and other

23   information by which the claim can be identified, processed and paid.  The claim form also

24   includes JCL's usual and customary billed charges.  As set forth above, those charges are

25   submitted on industry standard forms, commonly known as Uniform Billing ("UB") forms.

26        66.    As is standard in the industry, the "charges" by JCL on the UB are the same

27   regardless of whether the payor is a private or public entity, contracted or non-contracted,

28   insured or uninsured.

67.     Aetna failed to properly reimburse JCL for emergency health care provided to their respective members.

68.     Aetna also failed to properly reimburse JCL for authorized elective health care provided to their respective members.

69.     In many cases, Defendants have paid JCL's claims far less than is due under the terms of the respective patient's ERISA plan, SPD, or EOC.  JCL is informed and believes that Aetna has priced and paid JCL's claims at inappropriately low rates.

70.     Moreover, as stated above, JCL's billed charges are reasonable and customary.

## FIRST CAUSE OF ACTION

### Enforcement Under 29 U.S.C. § 1132(a)(1)(B)

### For Failure to Pay ERISA Plan Benefits

### (Against Defendants)

71.     The allegations set forth above are hereby incorporated as if fully set forth herein.

72.     JCL alleges this claim for relief in connection with claims for treatment rendered to patients covered by self-funded health benefits plans governed by ERISA. This is a claim to recover benefits, enforce rights and clarify rights to benefits under 29 U.S.C. § 1132(a)(1)(B).

73.     JCL has standing to pursue these claims as an assignee of its patients' benefits under the ERISA plans.  As alleged above, as a condition of admission, every patient treated at JCL signed an Assignment of Benefits form agreeing to, *inter alia*, assign his or her health insurance benefits to JCL.  In *Misic v. Building Services Employees Health & Welfare Trust*, 789 F.2d 1374, 1379 (9th Cir. 1986), the Ninth Circuit determined that a provider who is "an assignee of [ERISA plan] beneficiaries pursuant to assignments valid under ERISA, has standing to assert the claims of his assignors" against their health plan. Therefore, JCL has standing to pursue this cause of action as an assignee of its patients' benefits under health benefit plans governed by ERISA.

1180726.3

74.     The formal mechanism for a health plan or plan administrator to explain why a claim is denied (meaning that the allowed amount is anything less than full billed charges) is an explanation of benefits ("EOB").  Aetna was required to issue EOBs in conformance with 29 U.S.C. § 1133 as implemented by 29 C.F.R. 2560.503-1. Specifically, under 29 C.F.R. § 2560.503-1(g), they were required to:

> . . . provide a claimant with written or electronic notification of any adverse benefit determination.  Any electronic notification shall comply with the standards imposed by 29 CFR 2520.104b-1(c)(1)(i), (iii), and (iv).  The notification shall set forth, in a manner calculated to be understood by the claimant –
>
>> (i)     The specific reason or reasons for the adverse determination;
>>
>> (ii)     Reference to the specific plan provisions on which the determination is based;
>>
>> (iii)     A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;
>>
>> (iv)     A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;
>>
>> (v)     In the case of an adverse benefit determination by a group health plan or a plan providing disability benefits,
>>
>>> (A)     If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request; or
>>>
>>> (B)     If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.
>>
>> (vi)     In the case of an adverse benefit determination by a group health plan concerning a claim involving urgent care, a description of the expedited review process applicable to such claims.

75.     Strict compliance with these requirements is now necessary, and only *de minimis* errors will be excused.  29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1).  The errors here were far from *de minimis*.[1]

76.     Rather, when each of the relevant claims was denied, Aetna gave a variety of explanations on the EOBs for why the claims would not be properly paid.  Aetna's explanations were vague, and at times, nonsensical.  The commonality is that, not once did Aetna every comply with the ERISA regulations and state the true reason for its failure to pay claims at the proper rate.

77.     The same is true for appeals.  JCL has exhausted all administrative remedies available to it, by fully appealing every adverse claim determination made by Aetna in the normal course of business.  Appeal response letters are subject to essentially the same requirements as EOBs.  29 C.F.R. § 2560.503-1(j).  *See Ellis v. Met. Life Ins. Co.*, 126 F.3d 228, 237 (4th Cir. 1997) ("The notice requirement for the decision on review must be every bit as explicit as an initial denial notice in terms of providing specific reasons for the continued denial and specific references to the pertinent plan provisions.").  Yet, Aetna's appeal denial letters were just as vague – and in many cases, nonsensical – as the EOBs.  In any event, none of the appeal denial letters revealed the true reason for denial – *i.e.*, Aetna's apparent belief that JCL was not entitled to the 90% post-termination rate under the terms of the MCA.

78.     Moreover, as noted above, during the appeals process, Aetna never denied claims on the basis that JCL had obtained an inadequate assignment of benefits, or that JCL was not otherwise a valid assignee of benefits with respect to the patients whose bills are at issue here.  To the contrary, Aetna fully entertained and adjudicated JCL's appeals

---

[1]  "*De minimis*" errors are ones that (i) cause no prejudice or harm, (ii) were for good cause, (iii) due to matters beyond the plan's control, (iv) occurred in the context of an ongoing, good faith exchange of information between the plan and the claimant, and (v) is not part of a pattern or practice of violations by the plan.  29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(2).

1    (albeit wrongly).

2        79.    To the extent there are any stray claims that were not fully appealed, in light

3    of Aetna's grievous breach of its obligations (including, but not limited to, Aetna's

4    insufficient EOBs), and systematic failures, nonetheless, JCL "shall be deemed to have

5    exhausted the administrative remedies under the plan . . . ." 29 C.F.R. § 2560.503-1(l).

6    Similarly, for the same reason, any further appeals would have been futile.

7        80.    In light of Aetna's breaches, a *de novo* standard of review should be applied

8    here.  But even if some deference were accorded to Aetna's decision not to adjudicate and

9    pay the 90% billed charge post-termination rate, that decision is clearly erroneous,

10   arbitrary and capricious.

11       81.    On information and belief, the benefit plan for each of the patients whose

12   bills are at issue in this action contain identical, nearly identical or indistinguishable

13   language regarding how JCL should be reimbursed.  Specifically, once JCL was no longer

14   in Aetna's network, then reimbursement was keyed of what Aetna calls "Recognized

15   Charge."  On information and belief, each and every relevant plan document provides that

16   only "covered expense" will be reimbursed, and that "covered expense is only that part of

17   a charge which is the recognized charge."  "Recognized charge" is defined as the lesser of

18   what the provider bills or some other metric or formula.  As relevant here, many of the

19   plans further provide:  "**If Aetna has an agreement with a provider (directly, or**

20   **indirectly through a third party) which sets the rate that Aetna will pay for a service**

21   **or supply, then the recognized charge is the rate established in such agreement**."

22   Other plans have slightly different language, which provides as follows:  "In some

23   circumstances, Aetna may have an agreement with a provider (either directly or indirectly

24   through a third party) which sets the rate that Aetna will pay for a service or supply.  **In**

25   **these instances, in spite of the methodology described above, the Recognized Charge**

26   **is the rate established in such agreement**."  In sum and substance, the two formulations

27   of this provision mean exactly the same thing.  This provision controls here, across-the-

28   board, for all claims for which JCL is asserting an ERISA cause of action.

82.     Section 7.5.1. of the MCA was a direct "agreement" between Aetna and JCL for rates that would be paid for one year following termination, *i.e.*, once JCL was no longer a network provider.  Aetna acknowledged as much because, for some claims not at issue here, Aetna actually instructed Other Payors to pay according to the correct, 90% billed charge rate.  Having for years enjoyed the benefits of the discount contract rates in the MCA, Aetna is precluded from pretending as though there was no binding "agreement with a provider," within the meaning of plan language.

83.     As a result of Aetna's plainly erroneous interpretation, Aetna caused the Other Payors to provide far less in plan benefits than was required by the clear plan language.  Given that Aetna made the decision to deny benefits, it is liable for the difference between what should have been paid and the amounts that were actually paid, plus applicable interest.

## SECOND CAUSE OF ACTION

### Breach of Contract – Provider Agreement

### (Against all Defendants)

84.     The allegations set forth above are hereby incorporated as if fully set forth herein.

85.     Separate and apart from the derivative ERISA rights assigned by the patients to JCL, JCL also has direct rights against Defendants under the MCA.

86.     As alleged above, surviving Section 7.5.1 of the terminated MCA provides as follows:

> Upon termination of this Agreement for any reason, other than termination by Company in accordance with section 7.4 above, Hospital shall remain obligated <u>at Company's sole discretion to provide Hospital Services</u> to: (a) any Member who is an inpatient at Hospital as of the effective date of termination until such Member's discharge or Company's orderly transition of such Member's care to another provider, the terms of this Agreement shall apply to such services; and (b) any Member, who has received prior authorization or has been scheduled for services or is in their second or third trimester of pregnancy, for up to one (1) year.  The terms of this Agreement shall apply to such services. ***<u>All other services shall be reimbursed at ninety percent (90%) of billed charges</u> for up to one (I) calendar year.***  (Emphasis added)

87.     Aetna cannot argue that they are somehow surprised by JCL's charges because (1) Aetna had years of experience receiving claims with those charges; and (2) Arizona law has well-established comprehensive guidelines and procedures for setting, filing, review and disclosure of hospitals rates and charges.  A.R.S. §§ 36-436 to 436.03.  JCL complied with all Arizona laws concerning the setting, filing, review and disclosure of hospitals rates and charges, and as such continuously makes such rates publicly available to everyone, including Aetna.

88.     Under Arizona law, "There is nothing illegal or unauthorized, however, about hospitals contracting with insurers and government entities to accept reduced payments in satisfaction of their published rates, in return for an anticipated volume of business and prompt payments.  Nor does the fact that hospitals routinely accept reduced payments on behalf of many patients mean that the published and billed rates are unreasonable."  *Banner Health v. Medical Sav. Ins. Co.*, 216 Ariz. 146, 151-52 (2007).

89.     Aetna entered into the MCA on behalf of, and for the benefit for, its affiliates, including the Other Payors.  Indeed, under the terms of the MCA, Aetna could – and, on information and belief, did contract with the Other Payors wishing to utilize the services of Aetna's the Managed Care Network, and incorporating the terms and conditions of this Agreement."  The MCA defines Payors to include "an employer, insurer, health maintenance organization, labor union, organization or other person or entity which has agreed to be responsible for funding benefit payments for Covered Services provided to Members under the terms of a Plan."  The MCA defines Plan as "any health benefit product, plan or program issued, administered, or serviced by Company or one of its Affiliates, including but not limited to HMO, preferred provider organization, indemnity, Medicaid, Medicare and Workers Compensation."

90.     Further, by accepting the benefits of the MCA, Defendants became bound by its terms.  *See Duncan v. Nowell*, 27 Ariz. 451, 456 (1925) ("The rule of law is that one who seeks to take advantage of a contract made for his benefit by another must take it subject to all legal defenses and inherent equities arising out of the contract as between the

1   parties thereto, and must bear the burdens thereof.").

2       91.    The surviving Discounted Post-Termination Rate remained effective for up

3   to one year, including claims with dates of service from March 1, 2014 through December

4   31, 2014.

5       92.    Absent the benefit of the Discounted Post-Termination Rate, Defendants

6   were required to reimburse JCL for medical services provided to their respective members

7   and insured at 100% of the hospital's billed charges.

8       93.    JCL fully performed all of its obligations under the MCA.

9       94.    Defendants materially breached the Provider Agreement by failing to pay

10  JCL the Discounted Post-Termination Rate, for its post-termination claims as set forth in

11  Section 7.5.1 of the MCA.

12      95.    As a direct and proximate result of Defendants' breaches of the MCA, JCL

13  has been damaged according to proof at trial.

14                          **THIRD CAUSE OF ACTION**

15                      **Breach of Implied-In-Law Contract**

16                            **(Against Defendants)**

17      96.    The allegations set forth above are hereby incorporated as if fully set forth

18  herein.

19      97.    To the extent that Aetna contends it was not obligated to pay the Discounted

20  Post-Terminated Rates for claims with dates of service from March 1, 2014 through

21  December 31, 2014, they were and are legally obligated to pay rates which are <u>higher</u> than

22  the Discounted Post-Termination Rates.

23      98.    The common law imposes an implied-in-law contract between those who

24  render immediately necessary medical care in an unofficious manner to a patient, and those

25  who have a responsibility to the patient to pay for that medical care, with the rate being

26  implied by the law to be either JCL's charges or at *quantum meruit* fair market value of the

27  service, which also equals JCL's charges.

28      99.    Federal and state laws support an implied-in-law contract whereby JCL was

1   legally required to provide emergency services and care to the members, upon which

2   Defendants became legally required to pay JCL directly for such services rendered to their

3   respective members.

4          100.    JCL is informed and believes, based on the verifications, authorizations and

5   representations that it obtained from Aetna regarding each of the patients, made by Aetna,

6   on its own behalf and/or on behalf of the Other Payors, that Aetna bears financial

7   responsibility to pay for the services that JCL rendered to one or more of the patients.

8   Therefore, Aetna received the benefit from JCL satisfying their respective obligations to

9   their respective members who were patients of JCL.

10         101.    As explained above, the manner in which Aetna has structured its business

11  with the Other Payors, and the way Aetna communicated with JCL, often makes it

12  unknown to JCL (a) which of the Patients were insured directly by Aetna itself; (b) which

13  of the patients were only administered by Aetna on behalf of one of the Other Payors; and

14  (c) for the latter which of the Other Payors is financially responsible for which of the

15  administered patients.  But JCL is informed and believes that Aetna used the same set of

16  Aetna systems, policies and procedures for handling all of the claims for all of the patients.

17         102.    The common law also imposes an implied-in-law contract to pay for non-

18  emergency services that a defendant has indicated through words or deeds that the

19  defendant would pay for.  As explained above, Aetna, on behalf of itself, and on behalf of

20  the Other Payors when one of them was financially responsible for a Patient, represented

21  to JCL that the services would be paid for by Aetna.  These words or deeds took the form

22  of industry standard verifications, authorizations, and representations, as alleged above.

23         103.    Since the termination of the MCA, JCL has provided emergency services to

24  patients who JCL is informed and believes are members and insureds of Aetna or one of

25  the Other Payors.  JCL's emergency and post-stabilization services were immediately

26  necessary to prevent serious bodily harm to or suffering by such person, and JCL's

27  authorized, non-emergency services were medically necessary.

28         104.    JCL provided each of these immediately necessary services unofficiously

1    and with the intent to charge its billed charges for its services.

2        105.    JCL provided such services with the reasonable expectation of payment from

3    Defendants, based on such the totality of the circumstances, including but not limited to,

4    the industry standards, and the verifications, authorization and representations by the

5    Defendants.

6        106.    As alleged above, JCL is informed and believes Aetna was empowered to act

7    or the following purposes for all of the claims at issue in this case: certifying or authorizing

8    JCL's provision of services to members; receiving JCL's claims; pricing the claims;

9    processing and administering the claims and appeals; approving or denying the claims;

10   directing each other as to whether and/or how to pay the claims; issuing remittance advices

11   and explanations of benefits; and in many instances making payment.

12       107.    JCL confirmed that the patients were eligible insureds or members of

13   Defendants by contacting Aetna directly or through an online insurance verification

14   services based on information provided by Aetna.

15       108.    Under the federal Emergency Medical Treatment and Active Labor Act

16   ("EMTALA"), Social Security Act § 1867(a) and A.R.S. § 20-2803, JCL is required to

17   provide emergency services and care to all individuals, including members of Defendants,

18   who present themselves at its emergency department with potentially life-threatening

19   conditions, without regard to the patients' ability to pay or their possession of insurance

20   benefits.   A.R.S. § 20-2803 presumes that emergency services provided to patients with

21   health care coverage will be paid for by the patients' health care services plan.

22       109.    Therefore, by law, when a member or insured of a Defendant presents

23   himself or herself to JCL's emergency room, JCL must treat that individual without regard

24   to the person's ability to pay and without first obtaining insurance verification or

25   authorization to provide the treatment.

26       110.    As set forth above, JCL obtained an assignment of benefits from each of

27   Defendants' members to whom it provided medical services, requiring the applicable

28   Defendant to pay JCL directly for the services rendered.

1180726.3

111.    After JCL provided emergency care to Defendants' members, JCL promptly submitted claim information to Aetna, as directed on the patients' insurance identification cards, to be processed for payment.

112.    Based on the totality of the circumstances set forth above, Defendants have impliedly requested that JCL perform the services, and implied-in-law contracts have arisen pursuant to which the Defendants are obligated to pay JCL for such services at JCL's billed charges.

113.    JCL also has a common law *quantum meruit* right to receive payment from third parties (like Defendants) who are responsible for paying for the services provided to their members.  Restatement of Restitution § 114, entitled the "Performance of Another's Duty to a Third Person in an emergency," provides as follows:

> A person who has performed the duty of another by supplying a third person with necessaries, although acting without the other's knowledge or consent, is entitled to restitution for the other therefor if:
>
> (a)  he acted unofficiously and with intent to charge therefor, and
>
> (b)  the things or services supplied were immediately necessary to prevent serious bodily harm to or suffering by such person

114.    JCL has provided emergency services and care to patients who are members of Defendants and intended to charge for the care provided.  JCL's services were immediately necessary to prevent serious bodily harm to or suffering by such person.

115.    JCL is informed and believes that these members pay premiums to the applicable Defendant in return for coverage under a healthcare service plan that includes coverage for emergency services and care.  Accordingly, in providing emergency services and care to each of Defendants' respective members, JCL intended to and has conferred a benefit on each Defendant.  JCL provided such services with the reasonable expectation of full payment for its services directly from the applicable Defendant.

116.    JCL performed duties that are the responsibility Defendants by providing medically necessary care to their members.  JCL provided these immediately necessary medical services unofficiously with the intent to charge its customary rates for its services.

117.   JCL's charges are reasonable and customary.

118.   Aetna cannot argue that it is somehow surprised by JCL's charges because (1) Aetna had years of experience receiving claims with those charges; and (2) Arizona law has well-established comprehensive guidelines and procedures for setting, filing, review and disclosure of hospitals rates and charges.  A.R.S. §§ 36-436 to 436.03.  JCL complied with all Arizona laws concerning the setting, filing, review and disclosure of hospitals rates and charges, and as such continuously makes such rates publicly available to everyone, including Aetna.

119.   Under Arizona law, "There is nothing illegal or unauthorized, however, about hospitals contracting with insurers and government entities to accept reduced payments in satisfaction of their published rates, in return for an anticipated volume of business and prompt payments.  Nor does the fact that hospitals routinely accept reduced payments on behalf of many patients mean that the published and billed rates are unreasonable."  *Banner Health v. Medical Sav. Ins. Co.*, 216 Ariz. 146, 151-52 (2007).

120.   JCL has performed all of the obligations required of it under its implied-in-law contracts with Defendants.

121.   Aetna has breached and continues to breach the implied-in-law contracts.  It is a standard in the health care industry that Defendants' payments to JCL for services provided to the patients in the absence of an agreement should be JCL's billed charges, which is an amount greater than the rates set forth in the terminated written contract between JCL and Aetna.  For the underpaid claims at issue, each of the Defendants paid less than JCL's total charges, and indeed in some cases paid at or below the rates set forth in the terminated written contract.

122.   There are too many instances of breach of implied-in-law contract to detail individually in this complaint without being cumulative.  Accordingly, a redacted list of claims at issue here is attached to this Complaint as Exhibit A.

123.   As a direct and proximate result of each of the Defendants' breaches, JCL has been damaged in an amount to be proved at trial, plus applicable statutory interest.

1    124.    Accordingly, there is due, owing and unpaid from each Defendant to JCL, an

2  amount to be proven at trial, plus applicable statutory interest.

3                          **FOURTH CAUSE OF ACTION**

4                      **For Breach of Implied-In-Fact Contract**

5                            **(Against Defendants)**

6    125.    JCL incorporates all allegations set forth in the above paragraphs as though

7  fully set forth herein.

8    126.    To the extent that Aetna contends that it was not obligated to pay the

9  Discounted Post-Terminated Rates for claims with dates of service from March 1, 2014

10 through December 31, 2014, they were and are legally obligated to pay rates which are

11 <u>higher</u> than the Discounted Post-Termination Rates.

12   127.    For all patients whose claims are at issue in this case, JCL confirmed that

13 they were eligible insureds or members of Defendants by contacting Aetna directly or

14 through an online insurance verification services, based on information provided by the

15 Defendants to contact Aetna.

16   128.    As set forth more fully above, in emergency situations, JCL is legally

17 obligated to provide patients with the medically necessary healthcare services they need

18 even without such verification, and Defendants are legally obligated to pay JCL for the

19 emergency care provided to their members.

20   129.    For each of the elective claims and/or when services were not emergent, JCL

21 typically contacted Aetna , acting on its own behalf or on behalf of the Other Payors, (a) to

22 inform them that an individual who believes that he or she has coverage from Aetna has

23 presented to the hospital for outpatient services, and (b) to verify that the individual is an

24 eligible member of Aetna, and (c) to verify that the hospital is authorized to provide the

25 outpatient services and care.  Aetna authorized the services or care or informed JCL that no

26 authorization was needed for JCL to perform the services for the patients.  In doing so,

27 Aetna intended to communicate to JCL, and JCL reasonably understood, that Aetna

28 requested that JCL provide the services to their members, and that Aetna would pay for

1180726.3

1   such services.

2      130.    The conduct between JCL and Defendants and all the surrounding

3   circumstances created an implied-in-fact contract.

4      131.    Defendants intended to enter into implied-in-fact contracts with JCL for

5   authorized or emergency services, or knew, or had reason to know, that JCL would infer

6   from Defendants' conduct that they intended to enter into contracts with JCL.

7      132.    At the time Aetna decided to authorize care for the patients whose claims

8   are at issue, Aetna knew of the published rates that JCL charges for its services.  The

9   claims at issue contained the rates that JCL charged for its various services.  Having

10   chosen to authorize such services, Aetna agreed to pay JCL at the rates JCL charges for its

11   services.

12      133.    Each of the Defendants acknowledged that they were obligated to pay JCL

13   for these services when they underpaid for these services based on claims submitted by

14   JCL directly to Aetna.  Defendants' unilateral determination to reimburse JCL less than its

15   billed charges on other claims is improper.

16      134.    JCL has performed all of the obligations required of it under its implied-in-

17   fact contracts with each of the Defendants.

18      135.    JCL has demanded that Aetna pay for the medical services it has provided to

19   the patients, and has sent claim information to Aetna for pricing, processing and payment.

20   JCL has demanded payment from each of the Defendants through Aetna on numerous

21   occasions, and has objected to the Defendants' unilateral decisions to delay payment,

22   reduce the amount of payment and/or deny payment to JCL for the medical treatment

23   provided to the patients whose claims are at issue.

24      136.    There are too many instances of breach of implied-in-fact contract to detail

25   individually in this complaint without being cumulative.  Accordingly, a redacted list of

26   claims at issue here is attached to this Complaint as Exhibit A.

27      137.    As a direct and proximate result of each of the Defendants' breaches, JCL

28   has been damaged in an amount to be proved at trial, plus applicable statutory interest.

**FIFTH CAUSE OF ACTION**

**For Intentional Interference with Prospective Economic Advantage**

**(Against Defendants)**

138.   JCL incorporates all allegations set forth in the above paragraphs as though fully set forth herein.

139.   JCL alleges this cause of action in the alternative in the event that Aetna is not found to be the agents of the Other Payors.  If there is no agency, then Aetna unlawfully interfered with what the Other Payors would have paid by telling the Other Payors that they could pay less than what was owed.

140.   As set forth herein, JCL alleges that enforceable contracts exist between it and the Other Payors.  However, to the extent that such alleged contracts do not exist or are not enforceable, a non-contractual economic relationship between JCL and the Other Payors exists and contains a probability of future economic benefits to JCL.

141.   Aetna at all relevant times knew and know of the existence of the economic relationship between JCL and the Other Payors.  In particular, JCL is informed and believes that the Defendants demonstrated their knowledge of this economic relationship by sending a statement instructing the Other Payors to pay specific amounts to JCL.

142.   Aetna engaged in intentional acts designed to disrupt JCL's relationship with the Other Payors.  Specifically, Aetna intentionally misrepresented to the Other Payors the appropriate rates for JCL's out-of-network services and thus intentionally instructed the Other Payors to pay JCL less than the reasonable and customary rates for those services.

143.   Aetna's acts were wrongful in that they breached Aetna's implied contracts with JCL and also were intentional and/or negligent misrepresentations.

144.   Aetna knew that the interference was certain or substantially certain to occur as a result of their actions.

145.   Aetna's conduct has actually disrupted JCL's relationship with the Other Payors.

146.   Aetna's conduct has in fact and proximately caused damages to JCL in

1180726.3

1    amounts to be proved at trial.

2        147.    There are too many instances of intentional interference to detail individually

3    in this complaint without being cumulative.  Accordingly, a spreadsheet of claims at issue

4    is attached to this Complaint as Exhibit A.

5        148.    Aetna's conduct was willful, oppressive and fraudulent.  JCL therefore is

6    entitled to punitive damages.

7                              **SIXTH CAUSE OF ACTION**

8                          **For Intentional Interference with Contract**

9                                 **(Against Defendants)**

10       149.    JCL incorporates all allegations set forth in the above paragraphs as though

11   fully set forth herein.

12       150.    JCL alleges this cause of action in the alternative in the event that Aetna is

13   not found to be the agents of the Other Payors, or surviving Section 7.5.1 of the terminated

14   MCA is not enforced as described herein.  If there is no agency, then Aetna unlawfully

15   interfered with what the Other Payors would have paid by telling the Other Payors that

16   they could pay less than what was owed.

17       151.    A contractual relationship exists between JCL and the Other Payors.

18       152.    Aetna entered into the MCA on behalf of, and for the benefit for, its

19   affiliates, including the Other Payors.  Indeed, under the terms of the MCA, Aetna could –

20   and, on information and belief, did contract with the Other Payors wishing to utilize the

21   services of Aetna's the Managed Care Network, and incorporating the terms and

22   conditions of this Agreement."  The MCA defines Payors to include "an employer, insurer,

23   health maintenance organization, labor union, organization or other person or entity which

24   has agreed to be responsible for funding benefit payments for Covered Services provided

25   to Members under the terms of a Plan."  The MCA defines Plan as "any health benefit

26   product, plan or program issued, administered, or serviced by Company or one of its

27   Affiliates, including but not limited to HMO, preferred provider organization, indemnity,

28   Medicaid, Medicare and Workers Compensation."  Each of the Other Payors sought and

1  accepted the benefits of the MCA by accessing JCL as an in-network provider and paying

2  discounted in-network rates, as a Payor under the terminated agreement.

3      153.    By accepting the benefits of the MCA, all Defendants – including the Other

4  Payors, became bound by its terms.  *See Duncan v. Nowell*, 27 Ariz. 451, 456 (1925) ("The

5  rule of law is that one who seeks to take advantage of a contract made for his benefit by

6  another must take it subject to all legal defenses and inherent equities arising out of the

7  contract as between the parties thereto, and must bear the burdens thereof.").

8      154.    Aetna at all relevant times knew of the existence of the contractual

9  relationship between JCL and the Other Payors.  In particular, JCL is informed and

10  believes that Aetna demonstrated its knowledge of this contractual relationship by

11  instructing the Other Payors to pay specific amounts to JCL.

12      155.    Aetna engaged in intentional acts designed to disrupt JCL's relationship with

13  the Other Payors.  Specifically, Aetna intentionally misrepresented to the Other Payors the

14  appropriate rates that they were obligated to pay and thus intentionally caused the Other

15  Payors to breach their contracts with JCL by paying less than the Post-Termination Rate or

16  alternatively, reasonable and customary rates for those services.

17      156.    Aetna knew that the interference was certain or substantially certain to occur

18  as a result of their actions.

19      157.    Aetna's conduct has actually disrupted JCL's relationship with the Other

20  Payors, including but not limited to inducing their breach of the contracts.

21      158.    There are too many instances of intentional interference to detail individually

22  in this complaint without being cumulative.  Accordingly, a spreadsheet of claims at issue

23  is attached to this Complaint at Exhibit A.

24      159.    Aetna's conduct has in fact and proximately caused damages to JCL in

25  amounts to be proved at trial.

26      160.    Aetna's conduct was willful, oppressive and fraudulent.  JCL therefore is

27  entitled to punitive damages.

28

1180726.3

1

## SEVENTH CAUSE OF ACTION

2

**For Declaratory Relief**

3

**(Against Defendants)**

4     161.   JCL incorporates all allegations set forth in the above paragraphs as though

5   fully set forth herein.

6     162.   A controversy has arisen between each of the Defendants and JCL as to

7   whether Section 7.5.1 of the MCA requires Aetna to pay for all other services based on

8   90% of billed charges.  JCL contends that it does.  Defendants contend that the last

9   sentence of Section 7.5.1 does not mean what it says, but instead Section 7.5.1 permits

10   Aetna to pay however they see fit for all other services, not addressed by the first two

11   sentences of the provision.

12     163.   A controversy has arisen between each of the Defendants and JCL as to the

13   methodology used by Aetna to calculate the reasonable and customary rate for services

14   rendered by JCL to Defendants' members.  JCL contends that to the extent Section 7.5.1 is

15   held not to require Aetna to pay 90% of JCL's full billed charges, then reasonable payment

16   for these services is 100%, absent any applicable or bargained for discount off of full billed

17   charges.  On the other hand, Defendants argue that they should be entitled to pay JCL at a

18   unilaterally determined rate of their choosing.

19     164.   As explained in detail above, JCL is informed and believes that Aetna's

20   methodology and systems for determining reasonable and customary and paying out-of-

21   network hospital claims are flawed, and inconsistent with the industry-standard reasonable

22   and customary definitions set forth in the applicable plans, EOCs, and SPDs.  Aetna takes

23   the position that the reimbursement rates paid to JCL for its claims during the Out-of-

24   Network Period were appropriate.

25     165.   Accordingly, JCL seeks a declaration that:

26       a.   Aetna and the Other Payors are required to pay for the services

27         rendered to their members in accordance with the terms of Section

28         7.5.1.

b.      In the alternative, if the contract rate is held not to apply, Aetna failed to properly price and pay claims at the appropriate *quantum meruit* rate.

**WHEREFORE**, JCL prays for judgment against Defendants as follows:

1.      For damages in an amount to be proven at trial, plus all applicable interest allowed at law;

2.      For restitution in an amount to be proven at trial, plus all applicable interest allowed at law;

3.      For all attorneys' fees and costs incurred in bringing this action, to the extent recoverable by law;

4.      For declaratory relief;

5.      For punitive damages;

6.      For injunctive relief; and

7.      For such other relief as the Court deems just and appropriate.

DATED this 27th day of February, 2015.


_____/s/_____
Alan Kelly
Attorney for Plaintiffs

1180726.3